**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

ZELAIDO RIVERA GARCIA, MAURA GONZALEZ SALINAS, ADRIAN RAMIREZ-CUEVAS, CAMERINA CUEVAS LOPEZ, KATHLEEN YANKOVIC, JOHN YANKOVIC,

Plaintiffs,

v.

METRO GANG STRIKE FORCE, RON RYAN, former Metro Gang Strike Force Commander, DOE OFFICERS 1-34, individually and in their official capacities, OTHER UNKNOWN DOE OFFICERS, CITY OF WEST ST. PAUL, a municipal corporation, HENNEPIN COUNTY, a direct political subdivision of the State, DAKOTA COUNTY, a direct political subdivision of the State, RAMSEY COUNTY, a direct political subdivision of the State, CITY OF ST. PAUL, a municipal corporation, CITY OF MINNEAPOLIS, a municipal corporation, WASHINGTON COUNTY, a direct political subdivision of the State, CITY OF MAPLEWOOD, a municipal corporation, CITY OF LINO LAKES, a municipal corporation, CITY OF BROOKLYN PARK, a municipal corporation, CITY OF RICHFIELD, a municipal corporation, METROPOLITAN COUNCIL, METRO GANG STRIKE FORCE

Case No. 09-cv-01996-JNE-SRN

**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

JURY TRIAL DEMANDED

**CLASS ACTION**

ADVISORY BOARD, MANILA ("BUD") SHAVER, Chief of the West ST. Paul Police Department, KEN SCHILLING, Inspector at the Hennepin County Sheriff's Office, DAVE BELLOWS, Chief Deputy of the Dakota County Sheriff's Office, BOB FLECTCHER, Sheriff of the Ramsey County Sheriff's Office, JOHN HARRINGTON, Chief of the St. Paul Police Department, ROB ALLEN, Deputy Chief of the Minneapolis Police Department, BILL HUTTON, Sheriff of the Washington County Sheriff's Office, DAVE THOMALLA, Chief of the Maplewood Police Department, DAVE PECCHLA, Chief of the Lino Lakes Police Department, DAVE INDREHUS, Chief of the Metro Transit Police Department, MICHAEL DAVIS, Chief of the Brooklyn Park Police Department, BARRY FRITZ, Captain of the Richfield Police Department,

Defendants.

1. This is a class action brought by Plaintiffs, on behalf of themselves and others similarly-situated, to recover damages and to impose injunctive relief under the Civil Rights Act, 42 U.S.C. § 1981, § 1983 *et seq.* ("CRA"), to recover monetary damages for negligence in the supervision and training of law enforcement employees and for liability based on *respondeat superior*, to recover monetary damages for civil tort conversion and

conspiracy to convert, for civil tort of assault, for civil tort of false imprisonment, and for violations of the Minnesota State Constitution. Plaintiffs seek remedies for themselves and the Class and Subclass for Defendants' negligence and unlawful deprivation of Plaintiffs' and class members' property and liberty.

## PARTIES

### Plaintiffs

**Zelaido Rivera Garcia**

2. Plaintiff Zelaido Rivera Garcia is now, and at all relevant times was, a resident of the City of Minneapolis, residing at 3816 – 24th Avenue, No. 1, Minneapolis, Minnesota.

3. All acts hereinafter alleged occurred on or about July 31, 2008. All officers were acting in their individual and official capacity, and contrary to law.

4. On or about July 31, 2008, the Plaintiff and his spouse drove to the City of Minneapolis impound lot with the lawful intent to pay the designated fee to release a motor vehicle.

5. After Plaintiff's arrival at the impound lot, Defendant Officers appeared and detained the Plaintiff and numerous other undocumented individuals who are putative class members of the herein alleged class.

6. Prior to informing the United States Immigration and Customs Enforcement ("ICE"), each of the persons, including Plaintiff Garcia, was frisked and searched.

7. No drugs or contraband were discovered; however, the personal property on Plaintiff Garcia's person was taken and he was placed on a nearby automobile hood, with the exception of $100 cash, which was taken by the Metro Gang Strike Force Officers.

8. At said time and place as alleged above, unknown Metro Gang Strike Force Officers illegally confiscated $100 from Plaintiff Garcia's wallet. Plaintiff was not aware of the taking until his wallet was returned without the $100. Plaintiff Garcia protested that his money was taken, but did not get it back, nor was he given any administrative notice of forfeiture of rights, pursuant to law.

9. Somewhat later in time, the Minnesota Gang Strike Force Officers, telephone representative of ICE, took Plaintiff Garcia and other undocumented persons at the impound lot to jail.

**Maura Gonzalez Salinas**

10. Plaintiff Maura Gonzalez Salinas is now, and at all relevant times was, a resident of the City of Minneapolis, residing at 2932 -15th Avenue South, No. 1, Minneapolis, Minnesota.

11. All acts hereinafter alleged occurred on or about June 2, 2009. At such time and place all officers were acting in their individual and official capacity, and contrary to law.

12. On or about June 2, 2009, numerous Metro Gang Strike Force Officers and Minneapolis Police Department Officers came to Plaintiff Salinas' apartment seeking to arrest her son, Paul Salinas for an alleged probation violation.

13. Subsequent to their arrival at Plaintiff Salinas' apartment, the Metro Gang Strike Force rounded up the family, insulted their national origin by stating multiple times that "Spanish is bullshit," and also ridiculed the foods eaten by Hispanic persons. During the search of Plaintiff Salinas' apartment, no drugs or contraband were discovered; however, Plaintiff Salinas' personal property was taken by the Metro Gang Strike Force and converted to their use.

14. Unknown Metro Gang Strike Force Officers illegally confiscated $900 in cash from Plaintiff Salinas' personal clothing drawer, as well as a 24k gold necklace worth approximately $600. Plaintiff Salinas was unaware that the cash and jewelry were taken until the police officers left the premises.

15. At no time during the search of Plaintiff Salinas's apartment, or subsequent thereto, did the Metro Gang Strike Force Officers issue any inventory receipt for certain material taken. The officers did list a receipt for

inventory taken, but the Metro Gang Strike Force failed to record and note that they had taken $900 cash and the 24k gold necklace.

16. On June 2, 2009, Plaintiff Salinas was the owner and possessor of the $900 cash and the 24k gold necklace. The cash was intended to pay her next month's rent. As a result of the taking of the cash, Plaintiff Salinas was unable to pay her rent and had to vacate the premises.

**Adrian Ramirez-Cuevas and Camerina Cuevas Lopez**

17. Plaintiffs Adrian Ramirez-Cuevas and Camerina Cuevas Lopez are now, and and at all relevant times were, residents of the City of Crystal, residing at 4323 Xenia Avenue North, Crystal, Minnesota.

18. All acts hereinafter alleged occurred on or about July 28, 2008, at the former apartment of Plaintiffs, namely, the Kentucky Lane Apartments in Crystal, Minnesota. At such time and place all officers were acting in their individual and official capacity, and contrary to law.

19. On or about July 31, 2008, Plaintiff Adrian Cuevas and his father, Norverto Cuevas, were at the apartment complex.

20. Plaintiff Adrian Cuevas was outside the apartment and had recognized the Metro Gang Strike Force Officers from a previous encounter. At that time, one or more of the Metro Gang Strike Force Officers knocked Plaintiff Adrian Cuevas down, handcuffed him, and took his keys away from

him. Plaintiff Adrian Cuevas did not give the officers consent to enter Plaintiff Adrian Cuevas' apartment.

21. The officers entered the apartment of Plaintiff Adrian Cuevas, without a warrant and without the consent of Plaintiff Adrian Cuevas, and apprehended Norverto Cuevas, throwing him to the ground, breaking one of his teeth. One of the Metro Gang Strike Force officers placed his foot on Norverto Cuevas' head to restrain him. Noverto Cuevas asked if any of the officers had a search warrant.

22. Once inside the premises, the officers literally tore up the apartment and conducted a search for drugs within the apartment. Plaintiff Cuevas' apartment contained no drugs or contraband.

23. At said time and place as alleged above, unknown members of the Metro Gang Strike Force Officers illegally confiscated approximately $2,800 from Plaintiff Adrian Cuevas' apartment. Plaintiff Adrian Cuevas was not aware of the taking of the money until after the officers left the premises. Approximately $2,000 was the property of Plaintiff Camerina Cuevas Lopez and said money was part of a savings club, "Comida," which is a traditional way the family saves money. The remaining money was partially owned by Plaintiff Adrian Cuevas and his father Norverto Cuevas, who has subsequently been removed to Mexico.

24. At said time and place as alleged above, the unknown Metro Gang Strike Force Officers illegally confiscated money from Plaintiffs Adrian Ramirez-Cuevas and Camerina Cuevas Lopez, who were the owners and possessors of the above-described property.

**Kathleen and John Yankovic**

25. Plaintiffs Kathleen and John Yankovic are now, and at all relevant times were residents of the City of St. Paul, residing at 1799 N. Edgerton Street, St. Paul.

26. At such time and place all officers were acting in their individual and official capacity, and contrary to law.

27. On June 12, 2008, Plaintiff Kathleen Yankovic and her husband were the owners and possessors of property and jewelry valued in excess of $7,500, having purchased the property on previous dates. Defendant Metro Gang Strike Force Officers unlawfully took and carried away Plaintiffs Yankovics' property and converted and disposed of it to their own use to the Plaintiffs' damage, in excess of $7,500.

28. When Plaintiff Kathleen Yankovic protested, stating that the property should not be taken by the police, the Officers laughed and made light of Plaintiff Kathleen Yankovic's protests and converted the property to their own use.

29. Plaintiff Kathleen Yankovic was given an inventory receipt, but many of the items that were taken from Plaintiff's home on the date and time in question were not formally noted, nor was Plaintiff given administrative notice as to how she might reacquire the property.

**Defendants**

30. In 2005, the Minnesota Legislature enacted Minnesota Statute, section 299A.641, which created the Gang and Drug Oversight Council and mandated that the Council establish the Metro Gang Strike Force ("MGSF"). This fiat dissolved the existing Minnesota Gang Strike Force.

**Governmental Units**

31. The following Governmental Units are parties to the ensuing Joint Powers Agreement Creating the Metro Gang Strike Force ("Agreement"), used to implement the legislative mandate:

City of West St. Paul, a municipal corporation;

Hennepin County, a direct political subdivision of the State;

Dakota County, a direct political subdivision of the State;

Ramsey County, a direct political subdivision of the State;

City of St. Paul, a municipal corporation;

City of Minneapolis, a municipal corporation;

Washington County, a direct political subdivision of the State;

City of Maplewood, a municipal corporation;

City of Lino Lakes, a municipal corporation;

City of Brooklyn Park, a municipal corporation;

City of Richfield, a municipal corporation;

Metropolitan Council.

Each of these Governmental Units assigns from its law enforcement agency or agencies its Chief Law Enforcement Officer, or his or her designee, to be a member of the Metro Gang Strike Force Advisory Board. The Governmental Units also provided police officers to act as MGSF personnel and to carry out the organization's purpose. However, those police officers never became employees of the MGSF. While the Board and the Metro Commander had a contractual duty to oversee and supervise the activities of MGSF personnel, the Governmental Units remained at all times the employer responsible for the acts of their employee police officers acting in this scope of their employment. Governmental Units were negligent in their duty to train and supervise their employee police officers, resulting in damages to Plaintiffs and class members.

**Defendant Board and Board Members**

32. Defendant Metro Gang Strike Force Advisory Board ("the Board") comprises the chief law enforcement officers (or their designees) from the agencies that participate in the MGSF. The Board was responsible for

supervising the Metro Commander. These Defendant Board members include:

Chair Manila ("Bud") Shaver, Chief of the West St. Paul Police Department,

Vice-Chair Ken Schilling, Inspector at the Hennepin County Sheriff's Office,

Dave Bellows, Chief Deputy of the Dakota County Sheriff's Office,

Bob Fletcher, Sheriff of the Ramsey County Sheriff's Office,

John Harrington, Chief of the St. Paul Police Department,

Rob Allen, Deputy Chief of the Minneapolis Police Department,

Bill Hutton, Sheriff of the Washington County Sheriff's Office,

Dave Thomalla, Chief of the Maplewood Police Department,

Dave Pecchla, Chief of the Lino Lakes Police Department,

Dave Indrehus, Chief of the Metro Transit Police Department,

Michael Davis, Chief of the Brooklyn Park Police Department, and

Barry Fritz, Captain of the Richfield Police Department.

The Joint Powers Agreement required the Board to select and supervise the Metro Commander, approve the selection of participating officers, set the priorities for the work of the MGSF, and approve all expenditures of the MGSF. The Board and its members were negligent in their duty to train and supervise their employee police officers, resulting in damages to Plaintiffs

and class members. Plaintiffs sue all defendants in both their individual and official capacities.

**Joint Venture**

33. Defendant MGSF is an entity created pursuant to Minnesota Statutes § 471.59, and § 299A.641, subd. 3, to coordinate the efforts of Defendant Governmental Units to prevent and investigate gang crimes.

**Metro Commander**

34. The Joint Powers Agreement required a Metro Commander to provide effective leadership and administrative coordination, direct officer assignments, oversee field operations, foster communication and cooperation with other law enforcement agencies in and outside the geographic region, and identify and facilitate necessary training for MGSF officers.

35. Defendant Ron Ryan was the Metro Commander of the MGSF. His tenure as Commander ended on October 10, 2008, when he retired. He had been Commander of the MGSF, and its predecessor entity, the Minnesota Gang Strike Force, for over 11 years. Plaintiffs sue Defendant Ryan in both his individual and official capacities.

**MGSF Personnel**

36. Governmental Units, Defendants to be added later, were required to recommend and provide licensed peace officers from their own law enforcement agencies to serve as MGSF personnel. However, MGSF Officers

at all times remained employees of their respective Governmental Units and were expressly not considered employees of the MGSF. Disciplinary matters were to be referred not to the Board, but to the Governmental Units' law enforcement agencies for investigation and disposition. Defendant Doe Officers 1-34 were at all times operating as loaned officers to the MGSF, acting within the course and scope of employment as a peace officer and were part of the MGSF at the time it became defunct on July 17, 2009. Other unknown officer Defendants were officers on assignment to the MGSF, acting within the course and scope of employment, during times relevant to this action, but ceased to be MGSF personnel sometime prior to July 17, 2009. Plaintiffs sue all defendants in both their individual and official capacities.

## JURISDICTION AND VENUE

37. The Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1337. The Court has jurisdiction over Plaintiffs' common law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

38. The MGSF had offices, conducted its affairs, housed paperwork, and carried out its investigations in this District. Some Plaintiffs and class members were injured by Defendants in this District. A substantial part of the events and omissions giving rise to this action thus occurred in this

District. Venue is therefore proper in this District pursuant to 28 U.S.C. § 1391(b).

39. Plaintiffs and proposed class representatives are asserting claims relating to the negligence of the Governmental Units, the Board, and the MGSF, due to the unlawful deprivation by MGSF Officers of Plaintiffs' personal property. As a direct, proximate and foreseeable cause of Defendants' negligent and unlawful conduct, the Plaintiffs and proposed class members each sustained damages.

**FACTS**

40. Governmental Units and Defendant Board and Board members breached their duty to train, supervise, and discipline the improper acts of their MGSF Officers who failed to provide receipts, inventory lists, and notices of the right to object to forfeitures, to Plaintiffs and putative class members.

41. Members of the MGSF engaged in a pattern and practice of using their apparent authority as police officers to extort cash and property from people coming into contact with the MGSF, particularly from those concerned about their immigration status who would naturally perceive that they had no ability to assert legal rights. While undocumented status can subject an alien to removal proceedings, it is not a crime. Yet, the members of this governmental "joint venture," whose purpose and scope is expressly limited to

preventing and investigating gang "crimes," intentionally targeted victims for purposes of extortion. In most instances, this illegal conduct by the MGSF and its officers against these Plaintiffs and putative class members was based on their immigration status or other vulnerability, ostensibly as though they were under investigation for or accused of a crime.

42. A targeted, deliberate place to conduct their thefts was the Minneapolis Impound Lot, where persons, including vulnerable aliens, would attempt to pick up their vehicles. MGSF Officers would often call the impound lot and ask if there were any "Mexicans" there attempting to pick up vehicles. MGSF Officers would show up at the impound lot, detain and search the individual, seize cash, the vehicle for forfeiture, or both; then, send the individual on his or her way without a receipt for the taken property. On many occasions, ICE officers were called to expedite the removal of aliens, which further precluded them from seeking legal redress to reacquire their rightful property.

43. MGSF Officers also engaged in the repeated practice of taking cash and personal property out of the homes of those on whom the police were serving a warrant, even though the cash or personal property was neither contraband nor evidence, nor listed in the warrant as items to be seized. MGSF Officers would then take the seized items without providing a receipt or inventory for the taken property.

44. MGSF Officers also seized vehicles and property without providing Plaintiffs and putative class members with due process and with proper notice, in the native language of Plaintiffs and class members, pursuant to Minnesota Statutes, section 609.5314. According to the statute, said notice is required to be given to anyone from whom the police seize property for forfeiture, of the opportunity to be heard and the right to object to the forfeiture.

## CLASS ALLEGATIONS

45. Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

46. **The Class** is defined as:

> All persons who have been stopped, questioned, arrested, frisked, detained, searched, or any combination, by an Officer or Officers serving on the MGSF, and whose property was taken without a receipt or inventory itemization and without notification of their right to contest the forfeiture.

47. **The Subclass** is defined as:

> All persons who have been stopped, questioned, arrested, frisked, detained, searched, or any combination, based on their national origin, by an Officer or Officers serving on the MGSF, and whose property was taken without a receipt or inventory itemization and without notification of their right to contest the forfeiture.

Excluded from the class are those whose encounters with MGSF Officers resulted in their indictment or other duly filed criminal complaint by a criminal prosecuting authority.

48. *Numerosity*: Plaintiffs do not know the exact size of the proposed Class or Subclass, or the identities of all their members because such information is in the exclusive control of Defendants. Plaintiffs, however, believe that the Class and Subclass encompass at least 200 individuals. Therefore, the Class is so numerous that joinder of all members is impracticable.

49. *Commonality/Predominance*: All members of the Class have been subject to and affected by the same conduct. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to:

a. whether Governmental Units owed a duty of care to properly train and supervise its employee police officers, who came into contact with Plaintiffs and class members;

b. whether Governmental Units had sufficient policies and procedures in place to ensure that their officers were trained and supervised properly;

c. whether the lack of Governmental Units' training, supervision, policies, and procedures caused police officers loaned to the MGSF to develop a pattern and practice of engaging in improper forfeiture practices pursuant to Minn. Stat. § 609.5314 without detection for many years;

d. whether Governmental Units are the true employers of MGSF Officer;

e. whether Governmental Units are also vicariously responsible for the acts of MGSF Officers based on *respondeat superior* principles;

f. whether Defendant Board and Board Members owed a duty of care to properly train and supervise its employee police officers, who came into contact with Plaintiffs and class members;

g. whether Defendant Board and Board Members had sufficient policies and procedures in place to ensure that their officers were trained and supervised properly;

h. whether the lack of Defendant Board's and Board Members' training, supervision, policies, and procedures caused police officers loaned to the MGSF to develop a pattern and practice of engaging in improper forfeiture practices without detection for many years;

i. whether Defendants were required to provide receipts of seized property;

j. whether Defendants were required to provide notices of the right to contest the forfeiture of property;

k. whether Defendants repeatedly failed to provide receipts of seized property;

l. whether Defendants repeatedly failed to provide notice of the right to contest the forfeitures as required by Minnesota law (Minn. Stat. § 609.5314);

m. whether Defendants acted under color of law when improperly seizing property;

n. whether Defendants failed to create records of seized property and incidents leading to the seizure of property;

o. whether Defendants failed to properly maintain records of seized property and incidents leading to the seizure of property;

p. whether Metro Commander Defendant Ryan was aware of the pattern of improper seizures and forfeitures;

q. whether Metro Commander Defendant Ryan agreed and conspired with MGSF officers to commit illegal acts;

r. whether Metro Commander Defendant Ryan committed an overt act in furtherance of the conspiracy;

s. whether the MGSF retained seized property;

t. whether the MGSF had a pattern and practice of targeting and exploiting individuals of foreign national origin;

u. whether the MGSF had a pattern and practice of targeting and exploiting individuals who were suspected of committing crimes, but were never prosecuted after their property was illegally taken;

v. whether the Board or Board members should have been aware of the pattern of improper seizures and forfeitures;

w. whether Governmental Units should have been aware of the pattern of improper seizures and forfeitures;

x. whether Defendants affirmatively abandoned their duty to supervise MGSF personnel.

50. *Typicality*: The claims of the named Plaintiffs are typical of the claims of the Class and Subclass and do not conflict with the interests of any other members of the Class or Subclass in that both the Plaintiffs and the other members of the Class were subjected to search and seizure without the provision of a receipt or notice of ability to contest the forfeiture. Prosecution of Plaintiffs' claims will inure to the benefit of the entire proposed class.

51. *Adequacy*: The named Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to the vigorous

prosecution of the Classes' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions. Neither Plaintiffs nor counsel have any interest adverse to those of Class members.

52. *Superiority*: A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

53. In the alternative, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate, final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## LEGAL BASES FOR RELIEF

### COUNT I
### Violation of the Civil Rights Act
### 42 U.S.C. § 1983 (Monell Claim)
### (Against Governmental Units, MGSF Advisory Board, and Defendant Ryan)

54. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

55. Defendant MGSF Advisory Board and Defendant Ryan, through their employees and members, failed to properly train, supervise, and discipline the MGSF members who violated Plaintiffs' constitutional rights. Therefore, the unconstitutional and illegal actions of the MGSF members

were carried out pursuant to an unconstitutional policy, procedure, or practice of Defendant MGSF Advisory Board, in violation of Plaintiffs' and class members' Fourth, Fifth, and Fourteenth Amendment Rights.

56. Governmental Units were responsible for appointing, supervising, training, disciplining, and terminating all law enforcement officers and other employees of their respective law enforcement agencies. Governmental Units were the employers of MGSF personnel and were responsible for providing supervision and training for their law enforcement officers.

57. Governmental Units and Defendant Board and Board Members had actual knowledge that unless MGSF law enforcement officers were well trained and supervised pertaining to the appropriate police procedures, members of the public were subject to having their property forfeited without due process.

58. Governmental Units and Defendant Board and Board Members knew, or in the exercise of reasonable care, should have known, that the problem of improper forfeitures was a prevalent problem existing in the Twin Cities Metro Area through the unlawful operation of the MGSF that they duly created and managed.

59. Governmental Units and Defendant Board and Board Members failed to take steps to train and supervise their respective law enforcement officers and staff and failed to establish adequate procedures to ensure that

members of the public, such as the Plaintiffs and other putative class members, were not subjected to unlawful forfeiture procedures and activities.

60. Governmental Units and Defendant Board and Board Members failed to establish policies and procedures, substantially resulting in the rampant, improper use of forfeiture procedures.

61. At all times material, the Defendants' actions or failures to act became a custom or policy resulting in the deliberate indifference to constitutional rights of citizens including the Plaintiffs.

62. At all times material, the Defendants either instituted an improper policy or an absence of a policy for the necessary and proper execution of their duties; and, such failures resulted in the deliberate indifference to the constitutional rights of citizens including the Plaintiff.

63. The Legislative Auditor found that the MGSF failed to have sound fiscal management. The failure to establish a system of creating receipts and complete inventory lists and of basic accounting for all forfeited property constituted a failure on the part of Governmental Units and Defendant Board and Board Members to establish appropriate procedures and to supervise and train their law enforcement personnel, which was so severely deficient as to reach the level of gross negligence and deliberate indifference to the deprivation of constitutional rights of members of the public, including Plaintiffs and putative class members. Hennepin County Sheriff Rich Stanek

admitted that the recent revelation that West St. Paul Police Chief, and MGSF Chair, Bud Shaver asked the MGSF not to seize his own automobile, used in the commission of an alleged crime, was merely "one in a series of things that hurt the [MGSF]'s credibility, to the point where I didn't think it had much value on behalf of the citizens of Hennepin County or the law enforcement agencies on the Hennepin County side." "At the very least," Stanek said, "I think people agree there was lack of managerial oversight [of MGSF officers]."

64. Governmental Units and Defendant Board and Board Members failed to supervise, train, and discipline their law enforcement officers and personnel, their failure to establish appropriate procedures to prevent improper forfeiture procedures resulted in a deprivation of rights, privileges and immunities guaranteed to the Plaintiff under the Constitution and laws of the United States.

65. As a proximate result of Defendant's systematic violation of this statute, Plaintiffs and the class are entitled to the requested relief provided under the Act.

**COUNT II**
**Violation of the Civil Rights Act**
**42 U.S.C. § 1981**
**(Against All Defendants by Plaintiffs Garcia, Salinas, Ramirez-Cuevas, Lopez, and Subclass members)**

66. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

67. The Civil Rights Act ascribes to every person within the jurisdiction of the United States the right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

68. The MGSF intentionally discriminated against Plaintiffs and the class by targeting them due to their national origin. As undocumented aliens, Plaintiffs and class members were particularly vulnerable because they 1) typically do not have bank accounts, and so often carried cash[1] and 2) perceived themselves as having no rights and no ability to defend themselves from civil malfeasance. Members of the MGSF knew of these vulnerabilities and exploited them for personal gain.

69. Members of the MGSF took targeted persons based on their Latino national origin, converted their property without any process, and failed to account for the property in any way, whether through receipt or

---

[1] *See* Remarks of Martin J. Gruenberg, Vice Chairman, FDIC at IADI's Sixth Annual International Conference; Kuala Lumpur, Malaysia; November 1, 2007.

inventory recordation. Governmental Units, Defendant Board, Board Members, Metro Commander, the MGSF, and Officers are liable for these violations.

70. As a proximate result of Defendants' systematic violation of this statute, Plaintiffs and the class are entitled to the requested relief provided under the Act.

**COUNT III**
**Violation of the Civil Rights Act**
**42 U.S.C. § 1983**
**(Against Officers 1-34 and Other Unknown Officers)**

71. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

72. The Civil Rights Act of 1871 imposes liability on every person who, under color of any statute, ordinance, regulation, custom, or usage, subjects, or causes to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

73. Defendants, under color of Minnesota Statute, section 299A.641, subdivision 3(2), which created a state level Gang and Drug Oversight Council with a mandate to establish multi-jurisdictional task forces and strike forces across the state, subjected, and caused to be subjected, Plaintiffs and putative class members to the deprivation of their rights, privileges, or

immunities secured by the Constitution and laws. Defendants deprived Plaintiffs and class members of their property and liberty rights without due process of law, in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

74. As a proximate result of Defendants' systematic violation of this statute, Plaintiffs and the class are entitled to the requested relief provided under the Act.

**COUNT IV**
**Violation of the Civil Rights Act**
**42 U.S.C. § 1985**
**(Against Defendant Ryan)**

75. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

76. Defendant Ryan conspired in Minnesota with the MGSF, for the purpose of depriving, either directly or indirectly, Plaintiffs and class members of the equal protection of the laws and of equal privileges and immunities under the laws.

77. Defendant Ryan was aware that MGSF Officers were committing theft of personal property and did nothing to prevent it. When confronted by improper "forfeitures" by MGSF Officers, by the Office of the Legislative Auditor, Ryan testified that it was known "copper mentality" to take unlawfully the property of suspects, or "mopes," who appeared to have nicer

things in their home or on their person than the police officers had. He asserted that "coppers like to take as much as they can, that's just the nature of the beast." Defendant Ryan also identified the fact that "illegal aliens" do not "ask for anything back anymore" as a reason why the MGSF was amassing so much cash and property.

78. As MGSF Commander, Defendant Ryan had the duty to supervise members of the MGSF and prevent and correct the criminal acts committed by them. He was in charge of the day-to-day operation of the MGSF, including staffing and record keeping. But Defendant Ryan did not provide any written policies on proper forfeiture procedures. Defendant Ryan acted in furtherance of the conspiracy by affirmatively removing his oversight duties when he knew of a pattern and practice of unlawful forfeitures, reflected in his knowledge of "copper mentality." Thus, Defendant Ryan knew that his actions which condoned this unlawful conduct were substantially certain to cause further conversion, theft, and unlawful deprivation of property. Minn. CIVJIG 60.10.

79. As a proximate result of Defendants' systematic violation of this statute, Plaintiffs and the class are entitled to the requested relief provided under the Act.

## COUNT V
## Violation of the Minnesota State Constitution
## (Against All Defendants)

80. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

81. Due to the action of each and every Defendant, by illegally taking Plaintiffs' and class members' property without any legal cause, the employees of all participating police forces and their respective municipalities violated the following provisions of the Minnesota State Constitution:

> Every person is entitled to certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character. Article I, § 8.
>
> Private property shall not be taken; destroyed . . . for public use without just compensation therefore, first paid or secured. Article I, § 13.

82. The apprehension of Plaintiffs and class members, although innocent, as a criminal suspect, is a public use under the Minnesota Constitution.

83. The individual and collective actions of police officers violated the above provisions of the Minnesota Constitution because innocent Plaintiffs and putative class members suffered a wrong and injury to property and character pursuant to Article I § 8, and, further, the officers took innocent Plaintiffs' and class members' property and this constitutes a "taking."

## COUNT VI
## Negligence
## (Against Governmental Units, Defendant Board, and Board Members)

84. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

85. Governmental Units and Defendant Board and Board Members had a duty to Plaintiffs and class members to conduct investigations in a reasonable manner.

86. Plaintiffs have complied with all conditions precedent and notice requirements of Minnesota Statutes, sections 373.06 and 466.05 and all the necessary defendant agencies have been properly placed on notice.

87. Governmental Units and Defendant Board and Board Members through their agents or employees acting within the course and scope of their employment, breached their duty to Plaintiffs and class members and were negligent in one or more of the following ways, but not limited hereto:

a. By failing to establish procedures and failing to instruct law enforcement personnel that they must employ methods that provide fair and reliable procedures for proper forfeitures;

b. By failing adequately to train MGSF officers not to target suspects based on national origin;

c. By failing adequately to train MGSF officers not to seize property without providing a receipt for items taken;

d. By failing adequately to train MGSF officers not to seize property in the course of serving a warrant without providing a complete, written inventory of property seized;

e. By failing adequately to train MGSF officers to write reports regarding all arrests;

f. By failing adequately to train MGSF officers to follow through with prosecution of persons arrested;

88. The failure to train and to implement policies and procedures regarding these issues ensured that there was no connection between MGSF police investigations and public accountability through constitutionally sound prosecution. This "disconnect" vanquished any incentive officers had to ensure that their conduct comported with the law. In other words, the lack of adequate training, adhering to proper procedures, and a lack of comporting with the MGSF's own disciplinary policies so separated officers' conduct from expected results that such negligent oversight led directly to the unfettered, rampant abuse of power by MGSF Officers.

89. As a direct and proximate result of the careless and negligent conduct of Governmental Units and Defendant Board and Board Members,

Plaintiffs and putative class members, suffered humiliation and monetary damages.

**COUNT VII**
**Civil Tort of Conversion**
**(Against Officers 1-34 and Other Unknown Officers)**

90. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

91. MGSF Officers exercised control over Plaintiffs' and putative class members' personal property, in the form of cash or other chattel, in a way that intentionally deprived the owner of possession of the property permanently, or for an indefinite period of time, resulting in an unjust taking.

92. Defendants, MGSF Officers, did not provide any receipt, inventory, or any paperwork whatsoever to Plaintiffs and class members in violation of Minnesota Statute 609.

93. As a result, Plaintiffs and class members are entitled to monetary damages.

**COUNT VIII**
**Civil Tort of Assault**
**(Against Officers 1-34 and Other Unknown Officers)**

94. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

95. MGSF Officers assaulted Plaintiffs and class members by intentionally causing apprehension of immediate offensive contact with them. MGSF Officers had the apparent ability to cause the offensive conduct, and Plaintiffs and class members had a reasonable apprehension that the immediate offensive contact would occur. In some cases, putative class members were unlawfully stopped, frisked, searched, and deprived of property in public. In other cases, class members were told that MGSF Officers had a warrant to arrest someone in their home or to search their home, after which the MGSF unlawfully deprived them of their property. In both cases, Defendants failed to act under color of law and caused a reasonable apprehension of immediate, offensive contact absent full compliance with police orders.

96. As a result, Plaintiffs and class members are entitled to monetary damages.

## COUNT IX
## Civil Tort of False Imprisonment
## (Against Officers 1-34 and Other Unknown Officers)

97. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

98. Members of the MGSF intentionally restricted the physical liberty of Plaintiffs and class members by words or acts, and Plaintiffs and class members were aware of the words or acts. The threat of the immediate

use of physical force was present in that MGSF members identified themselves as police officers. As such, Plaintiffs and class members believed that MGSF members had the ability to carry out the threat.

99. As a result, Plaintiffs and class members are entitled to monetary damages.

**COUNT X**
***Respondeat Superior***
**(Against Governmental Units)**

100. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

101. Because the conduct of Officers 1-34 and Other Unknown Officers in committing the acts described herein was done within the scope of their authority as officers of Governmental Units' law enforcement agencies, Governmental Units are vicariously liable for their conduct.

**Punitive Damages**

102. All Defendants' conduct, including Governmental Units, Board, and Board Members, was motivated by a nefarious motive or intent, or involved a willful, reckless or callous indifference to the federally protected rights and safety of Plaintiffs and others similarly situated. Punitive damages are therefore appropriate for a violation of 42 U.S.C. §§ 1981, 1983.

103. Under Minnesota Statutes, section 549.191, Plaintiffs must obtain leave of court to amend their complaint to seek punitive damages.

Plaintiffs therefore reserve their right to allege punitive damages under Minnesota Statutes, section 549.20, if applicable.

## PRAYER FOR RELIEF

**WHEREFORE,** the named Plaintiffs and the other members of the class pray for relief as against Defendants as follows:

1. Certification of the above-described class with the named Plaintiffs as class representatives;

2. For judgment for damages sufficient to compensate Plaintiffs and other members of the class for their damages, including but not limited to monetary damages, restitution, and replacement damages;

3. For interest, as permitted by law;

4. For an accounting of property, including but not limited to cash, seized by the MGSF;

5. For the appointment of a receiver to be custodian of all MGSF and Board records, including but not limited to receipts for property taken, notices of forfeiture, arrest records, warrant inventory sheets, warrants related to seized items, etc., some of which MGSF personnel had already attempted to destroy and thus spoliate;

6. For their reasonable costs, including attorneys' fees as permitted by law; and

7. For all other just and proper relief.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable.

**DATED** this 23rd day of September, 2009.

ZIMMERMAN REED, P.L.L.P.

By s/Robert R. Hopper
Charles S. Zimmerman (MN # 120054)
Robert R. Hopper (MN # 208760)
David M. Cialkowski (MN #306526)
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Phone: (612) 341-0400
Fax: (612) 341-0844

FISHMAN, BINSFELD & BACHMEIER, P.A.
Phillip F. Fishman (MN #29622)
8011 34th Avenue South, Suite #245
Bloomington, MN 55425
Phone: (612) 339-0033
Fax: (612) 339-3240
phil@fbblaw.com

THE ALVAREZ LAW FIRM
Alex Alvarez (FL# 946346)
355 Palermo Avenue
Coral Gables, FL 33134
Phone: (305) 444-7675
Fax: (305) 444-0075
alex@integrityforjustice.com

**ATTORNEYS FOR PLAINTIFFS**